# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAMON BOYD,               )
                                   )
            Petitioner,      )
          v.                  )      Criminal Action No.  12-125-1
                                   )      (Related to Civil Action No. 16-935)
                                   )
UNITED STATES OF AMERICA,     )      Judge Cathy Bissoon
                                   )
            Respondent.     )

## MEMORANDUM ORDER

Pending before the Court is Petitioner Damon Boyd's Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 (Doc. 345) filed at Criminal Action No. 12-125-1 and originally filed as Civil Action No. 16-935.  The Government has filed a Response to the Motion (Doc. 346), to which Mr. Boyd has filed a Reply (Doc. 352).  Petitioner contends in his motion that he was denied effective assistance of counsel under the Sixth Amendment to the Constitution based on his trial counsel's failure to file a motion challenging applications for wiretap orders to intercept communications on cellular telephones (and to seek a related Franks hearing); trial counsel's failure to advise him of the option to enter a guilty plea as to Count Two and proceed to trial on Count One only; and trial counsel's failure to properly determine and present to the Court the date on which his parole ended on his prior state sentences.  Petitioner also contends that the cumulative effect of trial counsel's ineffectiveness requires that he be afforded Section 2255 relief.  For the reasons stated herein, the Court will deny Petitioner's Section 2255 motion.

**BACKGROUND**

The Court writes exclusively for the parties and therefore sets forth only those facts that are necessary to the disposition of Petitioner's motion.

On May 15, 2012, Petitioner Damon Boyd was charged in two counts of a four-count Indictment with: (1) conspiracy to possess with the intent to Distribute 280 grams or more of cocaine base in violation of 21 U.S.C. § 846 ("Count One"); and (2) possession with the intent to distribute 28 grams of cocaine base, in violation of 21 U.S.C. § 841 ("Count Two"). Thereafter, the Government timely filed an Information and an Amended Information alleging that Boyd had two prior convictions and that he was subject to enhanced sentencing provisions pursuant to 21 U.S.C. § 851. Boyd pleaded not guilty to the charges against him.

The charges arose out of an investigation by the Federal Bureau of Investigation ("FBI"), in coordination with other federal and local law enforcement agencies, focused on heroin trafficking in the East Hills section of Pittsburgh, Pennsylvania. In particular, the primary targets of the investigation were members of the East Hills Bloods gang. The investigation initially involved surveillance of low-level heroin sellers on the streets, but eventually required the use of Title III intercepts of communications on numerous target telephones.

In August 2011, the Government sought the first of eight warrants to intercept communications of persons believed to be part of a heroin distribution conspiracy. The affiant in the warrant applications for the wiretap orders was Special Agent David N. Hedges. The Government first obtained permission to intercept communications made over the cellphones of Faheem Jackson and Dewan Valentine. By December 2011, the Government applied for and received permission to intercept calls occurring on cellphones used by Donte Bryant, Tory Bryant, Ramon Portis, Richard Bush, Anthony Lemon, Sherron Whitehead, and others. The

evidence showed that all of these men, and others, were participants in a larger heroin conspiracy.

The Government learned that dozens of people were communicating with Richard Bush about heroin he was supplying. One of the persons communicating with Bush about the heroin he was supplying was referred to by the Government as "Unknown Male #3." On November 13, 2011, the Government had intercepted several telephone conversations between Bush and Unknown Male #3, culminating in Unknown Male # 3 arriving at Bush's house. The Government sent officers to drive by Bush's house when Unknown Male #3 was believed to be at the house. The officers viewed a vehicle at Bush's house and it was determined that the vehicle was registered to a woman with a residence in Monroeville. The Government later determined that Damon Boyd resided at the same Monroeville residence. The agents therefore had reason to believe that Unknown Male # 3 was Damon Boyd.

The government sought a wiretap of Petitioner's telephone in December 2011. (Application, Misc. No. 11-216, Doc. 32.) Agent Hedges was the affiant on the supporting affidavit, dated December 15, 2011 (the "December Affidavit"). (Exhibit A to Gov. Opp. to Mot. Suppress, Doc. 127-1.) The application for the wiretap was approved on December 15, 2011. (Order, Misc. No. 11-216, Doc. 33.) At the time of the wiretap on Boyd's phone in December 2011, he remained "Unknown Male #3" because the agents could not rule out the possibility that Unknown Male # 3 might be someone else. The wiretap authorization was renewed by the Court on January 13, 2012. (Order, Misc. No. 11-216, Doc. 39.) Agent Hedges also prepared the supporting affidavit for the January 2012 renewal of the wiretap (the "January Affidavit"). (Exhibit B to Gov. Opp. to Mot. Suppress, Doc. 127-1.)

The evidence gathered by the agents showed that "Unknown Male #3" was a participant in a heroin distribution conspiracy; that he communicated with Bush regularly; and that he would talk to Bush about the quality of his heroin as reported by junkies who were "testers" of the heroin. (December Affidavit 52-54.) Between December 3, 2011, and December 5, 2011, "Unknown Male #3" and Bush discussed traveling to Michigan to meet a person thought to be a supplier of heroin. (Id. at 56-58.) Armed with evidence of Unknown Male #3's involvement in the heroin conspiracy, the Government sought and obtained a warrant to intercept calls placed to and from "Target Telephone #11," which was a Sprint cellphone used by "Unknown Male #3."

In the December Affidavit, the Government set forth its probable cause and incorporated each of its five earlier affidavits by reference. (Id. at 4-5, n.1-5.) The Government also set forth an 18-page statement of the necessity of the interceptions of all of the telephones. (Id. at 79-96.) As noted, the Court authorized the Government to intercept the calls on "Target Telephone #11," and interception of the calls began on December 16, 2011.

The conversations overheard by law enforcement during the wiretap of "Target Telephone #11" confirmed that "Unknown Male #3" was in fact Damon Boyd. (January Affidavit 42.) During the interception of Boyd's phone, Boyd spoke to Bush about their heroin-trafficking, as well as conversing with another unknown male to whom Boyd was selling drugs. (Id. at 42-54.) In applying for an extension of the wiretap on Boyd's telephone, the Government stated that investigators believed that Boyd was trafficking in heroin, crack cocaine, and cocaine. (Id. at 42.)

Shane Countryman, an Allegheny County Deputy Sheriff and member of the task force investigating the East Hills Bloods gang, participated in the investigation and reviewed the Title III Intercepts. In January 2012, Countryman and fellow law enforcement officers conducted

surveillance of Boyd and Carter Gaston when the Title III intercepts revealed that Boyd and Gaston intended to purchase narcotics. That surveillance revealed that Boyd and Gaston went to the street of Kenneth Townsend's residence. Approximately two hours after arriving on Townsend's street, surveillance observed Boyd and Gaston leaving Townsend's residence. In addition, surveillance observed Townsend outside of his residence and law enforcement officials were able to identify him.

After Boyd's meeting with Townsend, Title III intercepts indicated that Boyd had cocaine available for sale. Agents surmised that Boyd had obtained cocaine while at Townsend's residence. Boyd and Townsend arranged to meet again, according to intercepted communications, and the FBI and Countryman believed this meeting would also be to conduct a drug transaction. Accordingly, on February 1, 2012, surveillance of Townsend's residence was again initiated.

The surveillance revealed that Boyd and Gaston traveled to Townsend's residence in a Ford Expedition registered to Boyd and another individual. Approximately two hours after Boyd and Gaston arrived at Townsend's residence, they drove from the residence in the Expedition. The agents recognized that this was the same sequence of events that happened when Boyd went to Townsend's residence in January, after which Boyd indicated he had cocaine available for sale. The agents therefore had reason to believe that Boyd and Gaston were traveling with cocaine. Law enforcement officials at the scene knew that Boyd did not have a valid driver's license and had an active warrant for his arrest. The officers conducted a stop of Boyd's vehicle in order to arrest him.

Local law enforcement arrested Boyd pursuant to the arrest warrant. Prior to towing the vehicle, pursuant to normal procedures to inventory contents of vehicles, Countryman conducted

a search of the areas immediately accessible to Boyd and Gaston. During the search, Countryman noticed that the radio was not secured and he pulled slightly on the radio. When he did so, the dashboard moved creating a crease. When Countryman placed his fingers within the crease, the dashboard fell off revealing a "trap" where Boyd and Gaston stored their stash of crack cocaine. Concealed within the trap were plastic bags containing crack cocaine still wet from processing.

Based on the information set forth above, local law enforcement obtained a search warrant authorizing them to search Townsend's residence. Within Townsend's residence, law enforcement officials found what amounted to a small crack cocaine processing operation, including cocaine, baking powder, strainers, digital scales and other indicia associated with processing cocaine into crack cocaine. Subsequent laboratory analysis of the suspected crack cocaine found in Boyd's vehicle revealed that the substance was 224 grams of crack cocaine. Subsequent laboratory analysis of the suspected powdered cocaine found in Townsend's residence confirmed that the substance was, in fact, approximately 56 grams of cocaine. Townsend and Gaston were indicted as co-defendants of Boyd.

Prior to trial, Boyd's trial counsel filed motions to suppress the physical evidence and the intercepted communications. The Court held two separate suppression hearings, after which it denied both motions. A jury trial was held in April 2014. During his opening statement, Boyd's trial counsel conceded Boyd's guilt to Count Two. Boyd did not testify. On April 14, 2014, the jury found Boyd guilty of a lesser-included offense of Count One; that is, he was found guilty of conspiracy to distribute 28 grams or more of crack cocaine. The jury also found him guilty of possession with the intent to distribute 28 grams of crack cocaine as charged in Count Two.

The Probation Office and the Court determined that Boyd was a Career Offender under Section 4B1.1 of the United States Sentencing Guidelines because he had a 1995 state conviction for possession with intent to deliver cocaine, and a 1997 federal conviction for carjacking and RICO offenses, resulting in a criminal history category of VI and a total offense level of 37. (Presentence Report ¶¶ 31, 33, 42-43, 45, Doc. 227.) Thus, his advisory guideline range was 360 months to Life in prison, with a mandatory minimum term of 120 months. (Id. at ¶¶ 74-75.)

Trial counsel filed Objections to the Presentence Report, followed by a Sentencing Memorandum expanding on his objections, adding documentary support, and seeking a departure or variance from the guideline sentencing range. (Objections, Doc. 229; Sentencing Mem., Doc. 241.)

Relevant to the instant motion, trial counsel argued for an acceptance-of-responsibility adjustment under Section 3E1.1 because his counsel had conceded his guilt to Count Two during his opening statement at trial. He also argued in his Objections and his Sentencing Memorandum that Boyd's 1995 conviction was outside the 15-year window and thus did not count as a predicate Career Offender crime. In response to the Objection and Sentencing Memorandum, the Probation Officer maintained that Boyd's prior conviction qualified for purposes of determining career offender status. (Addendum to Presentence Report 4, Doc. 236; Supp. Addendum to Presentence Report 2-3, Doc. 244.)

The above objections and arguments were presented to the Court at Boyd's sentencing on August 7, 2014. After hearing argument, the Court overruled Boyd's objections, denied the request for an acceptance of responsibility adjustment, adopted the Presentence Report, as supplemented by the Addenda, and found that Boyd was imprisoned within the 15-year window for his predicate state offense thus qualifying Boyd as a Career Offender. The Court sentenced

Boyd to 360 months in prison on each count to run concurrently, to be followed by eight years of supervised release.

Boyd appealed his conviction and sentence. Trial counsel filed an <u>Anders</u> brief on December 15, 2014, and Boyd filed his own *pro se* brief on January 26, 2015. Trial counsel identified five issues that might arguably be raised on appeal: (1) whether the District Court erred in denying suppression of the physical evidence found in the vehicle; (2) whether the District Court erred in denying suppression of all communications intercepted from the wiretap of Boyd's phone; (3) whether the District Court erred in its sentencing findings and calculations; (4) whether he District Court erred in classifying Boyd as a career offender; and (5) whether the District Court erred in sentencing Boyd to 360 months incarceration.

In Boyd's *pro se* appeal brief he presented new arguments, including that prior to trial he was entitled to a <u>Franks</u> hearing. He also argued that his 1995 conviction was not a qualifying prior conviction because he was released from the sentence more than 15 years before the instant offense. On September 15, 2015, the United States Court of Appeals for the Third Circuit affirmed the judgment of conviction and granted counsel's motion to withdraw. <u>United States v. Boyd</u>, 625 F. App'x 183 (3d Cir. 2015).

Boyd filed a *pro se* Petition for a Writ of Certiorari to the United States Supreme Court, which was docketed in that Court at No. 14-3651. The Supreme Court denied certiorari on May 16, 2016. <u>Boyd v. United States</u>, 136 S. Ct. 2012 (2016). On June 23, 2016, Petitioner filed a timely Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 pursuant to <u>United States v. Johnson</u>, 135 S.Ct. 2551 (2015), in which the Supreme Court struck down the residual clause contained in the Armed Career Criminal Act as unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. The motion to vacate was stayed

pending resolution of the issue of whether <u>Johnson</u> afforded relief to petitioners challenging non-ACCA Guidelines sentences. The Supreme Court eventually issued a decision in <u>Beckles v. United States</u>, 137 S. Ct. 886 (2017), concluding that "the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause," and that therefore Section 4B1.2's residual clause is not void for vagueness. Therefore, under <u>Beckles</u>, the original basis for the motion to vacate was no longer viable.

On May 15, 2017, Petitioner filed a motion to amend his petition in which he sought leave to assert non-<u>Johnson</u> ineffectiveness of counsel claims not presented in his original petition. The Government objected to the amendment arguing that it was either a second or successive petition or that the claims were untimely. The Court concluded that the proposed amended petition did not constitute a successive petition and granted Petitioner's motion to amend. The amended petition was filed on December 11, 2017.

**ANALYSIS**

Pursuant to 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside or correct a sentence:

> [U]pon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a). As a remedy, the court must "vacate and set the judgment aside and . . . discharge the prisoner or resentence him [or her] or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). Relief under this provision is "generally available only in 'exceptional circumstances' to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the

rudimentary demands of fair procedure." United States v. Gordon, 979 F. Supp. 337, 339 (E.D. Pa. 1997) (quoting Hill v. United States, 368 U.S. 424, 428 (1962).

## I. Need for Evidentiary Hearing

A district court is required to hold an evidentiary hearing on a motion to vacate sentence filed pursuant to 28 U.S.C. § 2255 unless the motion, files and records of the case show conclusively that the movant is not entitled to relief. See 28 U.S.C. § 2255(b); United States v. Booth, 432 F.3d 542, 545-46 (3d Cir. 2005); United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994). Thus, if the record conclusively negates the factual predicates asserted in support of a Section 2255 motion, or if the movant would not be entitled to relief as a matter of law even if the factual predicates as alleged in the motion are true, an evidentiary hearing is not required. See Government of Virgin Islands v. Nicholas, 759 F.2d 1073, 1075 (3d Cir. 1985).

The Court finds no need for an evidentiary hearing here, as the record conclusively establishes that Petitioner is not entitled to the relief sought in the petition. See 28 U.S.C. § 2255. Accordingly, the Court will deny Petitioner's motion for an evidentiary hearing.

## II. Legal Standards

Petitioner argues that he was denied effective assistance of counsel under the Sixth Amendment to the Constitution. A "petitioner claiming a deprivation of his or her Sixth Amendment right to effective assistance of counsel must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused the petitioner prejudice." Ross v. District Attorney of the County of Allegheny, 672 F.3d 198, 210 (3d Cir. 2012) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "To show deficient performance, 'a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. . . . The challenger's burden is to show that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Ross, 672 F.3d at 210 (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Hinton v. Alabama, 571 U.S. 273, 274 (2014) (quoting Strickland, 466 U.S. at 690). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected . . . if they are based on professional judgment." Strickland, 466 U.S. at 681. "The Supreme Court directs that our 'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." United States v. Loughery, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting Strickland, 466 U.S. at 689).

With respect to prejudice, a petitioner must "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Hinton, 571 U.S. at 275 (quoting Strickland, 466 U.S. at 694); see also Ross, 672 F.3d at 210 (quoting Richter, 131 S. Ct. at 787).

### III. Petitioner's Ineffective Assistance Claims

Petitioner alleges his counsel was ineffective based on the following allegations: (1) counsel failed properly to challenge the wiretap applications on the basis that they contained false statements and material omissions and, relatedly, failed to file a motion for a Franks hearing; (2) counsel failed to advise Petitioner that he could plead guilty to Count Two, and proceed to trial on Count One only for the purpose of challenging the drug amount alleged in

Count One; (3) counsel failed to investigate properly and present to the Court the Pennsylvania Parole Board's adjustment to Petitioner's prior state sentences, resulting in a prior offense being counted as falling within the 15-year window of the United States Sentencing Guidelines, Section 4A1.2(e); and (4) if none of the above alleged ineffectiveness claims are by themselves sufficiently prejudicial, the cumulative prejudice resulting from counsel's conduct denied Petitioner his rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution to due process, a fair trial, fundamental fairness, and the effective assistance of counsel. The Court will consider each of these allegations in turn.

**A. Ground 1: Challenge to the Wiretap Application and <u>Franks</u> Hearing**

Petitioner's trial counsel filed a motion to suppress specifically challenging the Government's two applications for orders authorizing the wiretap of Petitioner's telephone. (Doc. 118.) The basis of the motion was the alleged failure of the Government to establish the necessity requirements for the wiretaps. A hearing on the motion was held on October 22, 2013, and the motion was denied. (Doc. 264.) Petitioner claims that counsel was ineffective for failing to raise a challenge to the Affidavits based on the allegation that they contained materially false statements or reckless omissions of fact.

Petitioner alleges that the Affidavits failed to include statements that the wiretap for Petitioner's telephone concerned a crack cocaine conspiracy unrelated to the primary heroin conspiracy that is mentioned throughout the Affidavits. Therefore, Petitioner argues that the Affidavits failed to establish probable cause for investigation of the unrelated crack cocaine conspiracy, and counsel was ineffective for failing to make this challenge. In addition, based on the allegation that the application contained materially false statements or reckless omissions of

fact, he argues that counsel was ineffective for failing to file a motion for a hearing under <u>Franks</u> <u>v. Delaware</u>, 438 U.S. 154, 155-56 (1978).

In support of his argument, Petitioner relies on <u>United States v. Carey</u>, 836 F.3d 1092 (9th Cir. 2016). In <u>Carey</u>, agents were monitoring a telephone number they believed was associated with a person named Ignacio Escamilla Estrada in furtherance of an investigation into his involvement in a possible drug smuggling and distribution conspiracy. It turns out the telephone number was actually being used by defendant Carey, a person who had no connection with Estrada. The agents overhead Casey engaging in illegal drug-related conversations, again with no connection whatsoever to the person for whom the Government obtained the Order to intercept communications.

The <u>Carey</u> Court held that, while monitoring wiretap conversations, law enforcement may use evidence unrelated to the target conspiracy obtained in "plain hearing," but once the agents knew or should have known that the overheard evidence is outside the target conspiracy, they must cease monitoring and seek a new application for a wiretap. <u>Id.</u> at 1093-94. The <u>Carey</u> Court noted that, under 18 U.S.C. § 2517(5), law enforcement is permitted to intercept and pursue evidence "relating to offenses other than those specified in the order of authorization of approval," but the Court had "found no case in which this statutory provision was used to authorize officers to listen to people who were unaffiliated with the initial wiretap subject." <u>Id.</u> at 1096. The case was remanded for the District Court to hear evidence as to when the agents knew or should have known that the overheard evidence related to Carey was outside the target conspiracy. <u>Id.</u> at 1099-1100.

Relying on Carey, Petitioner argues that by December 2, 2011, the agents here were aware or should have been aware that the overheard conversations relating to Petitioner concerned a separate crack cocaine conspiracy, and therefore all wiretap evidence from December 2, 2011, and after, would have been ruled inadmissible had counsel properly sought its suppression. Petitioner reaches this conclusion by pointing to trial testimony he asserts demonstrates the inaccuracy or falsity of the statements contained in the applications for wiretaps of Petitioner's telephone, as well as the omission of material information.

The Court disagrees. As noted, the sole authority cited by petitioner is a Ninth Circuit Court of Appeals case decided in 2016, well after Petitioner's trial had ended. Therefore, trial counsel could not have relied on Carey in preparation for a suppression motion to challenge the Affidavits in support of the Applications for wiretaps in this case.

Moreover, Carey is readily distinguishable from the present case. In Carey, while executing a wiretap order to investigate Estrada, the agents overheard conversations by Carey, a "speaker[] *unrelated* to the target conspiracy." Carey, 836 F.3d at 1093 (emphasis added). The agents later learned that there was "*no 'overlap'* between" the conspiracy Carey was involved in and the Estrada conspiracy. Id. at 1094 (emphasis added). The Carey Court characterized Carey's position as a person "*unaffiliated* with the initial wiretap subjects," id. at 1096 (emphasis added), and "the question here [as] whether the government could use [a] valid wiretap to listen to *unrelated* people's phone calls, id. at 1097 (emphasis added).

In this case, the evidence the Government had garnered showed that Petitioner was affiliated with the initial wiretap subjects, he was related to the target conspiracy, and there was overlap of persons and activities between the heroin and crack cocaine conspiracies. In addition, the Government properly identified the user of the intercepted telephone; that is, the Government

did not seek a wiretap for a telephone used by someone other than Petitioner, and then happen to overhear Petitioner's conversations. Rather, the wiretap intercept was initiated on Petitioner's telephone because the agents had gathered abundant evidence indicating that that the user of Target Telephone #11 was involved in the heroin conspiracy. The evidence established that Unknown Male #3, using Target Telephone #11, had numerous substantive communications with Bush about heroin and trafficking of heroin. See United States v. Reed, 575 F.3d 900, 911 (9th Cir. 2009) (allowing government to introduce intercepted conversations of co-conspirator intercepted on a wiretap for Reed, noting that the "Government did not get an order for the wrong phone, nor intercept calls on a phone for which they had no order.")

In addition, there was overlap between the participants in the heroin conspiracy and the crack cocaine conspiracy, specifically, between Bush and Petitioner. The government contends that it in fact had evidence that Petitioner participated in the heroin conspiracy, and the transcripts of the intercepted communications demonstrate this is true, but the Government had much stronger evidence against Petitioner as to the crack cocaine conspiracy and therefore elected to pursue those charges. Had trial counsel sought to suppress the evidence obtained from the wiretaps, counsel would have been unsuccessful. Therefore, his decision not to file such a motion cannot show ineffectiveness.

Nor would a motion for a Franks hearing have been successful. "The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit." United States v. Pavulak, 700 F.3d 651, 665 (3d Cir. 2012), citing United States v. Yusuf, 461 F.3d 374, 383–84 (3d Cir. 2006). A defendant may be entitled to a Franks hearing if he is able to make a "substantial preliminary showing" that the affiant knowingly or recklessly omitted facts from the affidavit (or included a false statement

in the affidavit) and is able to demonstrate that the omitted facts (or false statements) are "necessary to the finding of probable cause." Pavulak, 700 F.3d at 665 (quoting Yusuf, 461 F.3d at 383–84).

The United States Court of Appeals for the Third Circuit has applied Franks to cases in which the defendant alleges that facts have been deliberately or recklessly omitted from a supporting affidavit. United States v. Frost, 999 F.2d 737, 742-43 & n.2 (3d Cir. 1993). More specifically, the Third Circuit Court has explained that "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000).

Petitioner would not have been able to make a "substantial preliminary showing that the affidavit contained a false statement [or reckless omission], which was made knowingly or with reckless disregard for the truth." Pavulak, 700 F.3d at 665 (quoting Yusuf, 461 F.3d at 383). Petitioner again relies on allegations that trial testimony demonstrates that the investigating agents knew or should have known that the overheard conversations related to a crack cocaine conspiracy, not the heroin conspiracy, and therefore that this information should have been included in the applications for wiretaps of Petitioner's telephone. Because the Indictment concerned a crack cocaine conspiracy, the Government's trial testimony naturally concerned Petitioner's involvement in that conspiracy. Evidence of the overlap between the heroin and cocaine conspiracies was not introduced, as it would have been subject to challenge on the grounds of relevancy and prejudicial effect.

Nor did the government recklessly or intentionally omit facts about the crack cocaine conspiracy in the Affidavits. Petitioner was being investigated as part of a heroin conspiracy. The applications for wiretap orders reveal a careful investigation that was built on the facts as they were discovered during the course of the investigation. The Government identified Petitioner as a potential unknown suspect, but later identified him. Petitioner's conversations revealed involvement in trafficking heroin, crack cocaine, and cocaine. In applying for an extension of the wiretap on Petitioner's telephone, the January Affidavit stated that investigators believed that Petitioner was trafficking in heroin and crack cocaine. (January Affidavit 42.) Had counsel challenged the applications for wiretap orders on the basis of alleged falsehoods and omissions, the challenge would have been unsuccessful and a motion for a <u>Franks</u> hearing would have been denied. Accordingly, counsel was not ineffective for failing to raise a meritless claim, or move for a hearing that would not have been held.

**B. Ground 2: Failure to Advise Petitioner to Plead Guilty to Count Two**

Next, Petitioner argues that his trial counsel was ineffective in failing to advise him to timely plead guilty to Count Two and proceed to trial only on Count One in order to contest the quantity of drugs involved in Count One. As a result, he contends that he lost an acceptance of responsibility credit, the opportunity to seek further mitigation at sentencing, and ultimately the opportunity to receive a lower sentence.

Petitioner's counsel conceded his client's guilt as to Count Two in his opening statement. The Government contends that this was a strategic choice made by counsel that resulted in Petitioner avoiding a mandatory life sentence. As Petitioner states, however, there is no evidence to support that the decision to concede guilt at the beginning of trial as to Count Two was a strategy designed to avoid a life sentence. If in fact it was a strategic choice, it does not

answer Petitioner's present claim that he was prejudiced by his counsel's failure to advise him to concede guilt earlier. According to Petitioner, had he pleaded guilty prior to trial, he would have been able to accomplish the so-called trial strategy of avoiding a life sentence, yet also preserved additional opportunities for a lesser sentence: a potential 1- or 2-point acceptance of responsibility deduction; and, he would also have been able to argue for further mitigation of his sentence in light of his pretrial plea. Nonetheless, Petitioner's claim is insufficient to establish ineffectiveness of counsel.

Petitioner does not does not contend that the Government offered him a plea deal or that his counsel was ineffective for failing to negotiate a favorable plea deal. There is "no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." Weatherford v. Bursey, 429 U.S. 545, 561 (1977). Thus, as an initial matter, "counsel cannot be ineffective for failing to negotiate a plea if there was no plea offer made by the United States to be negotiated." United States v. Terry, No. 14-CV-1006, 2015 WL 4255527, at *5–6 (W.D. Pa. July 14, 2015) (citing Lafler v. Cooper, 566 U.S. 156, 168 (2012) and Missouri v. Frye, 566 U.S. 134, 148 (2012)).

Moreover, for the Government to have entered into a pre-trial plea bargain with Petitioner, knowing that Petitioner intended to proceed to trial on Count One, the only reasonable offer the Government would likely have been willing to make is an offer to withdraw the Section 851 Information and remove the enhanced punishment, and the possibility of a life sentence. In contrast, the Government had no incentive to offer to agree to an acceptance of responsibility adjustment, nor does Petitioner claim that it would have.

In addition, assuming that it was ineffective for trial counsel not to have advised Petitioner to plead guilty to Count Two prior to trial, the Court concludes that Petitioner cannot

establish prejudice.  As noted, Petitioner does not argue that the Government offered him a plea, nor does he argue that if he had chosen to plead guilty to Count Two prior to trial with no plea agreement, it was inevitable that he would have a received an acceptance of responsibility adjustment.  He argues, instead, that if he had pleaded guilty to Count Two prior to trial, he would have been in a more favorable position to argue to the Court for an acceptance of responsibility adjustment and a lower sentence.  Therefore, the issue is whether the outcome would have been different if Petitioner had been able to argue to the Court at sentencing for an acceptance of responsibility adjustment based on the hypothetical pre-trial guilty plea, and to further argue for mitigation based on this pre-trial plea.

The answer is no.  Petitioner still would have maintained that he was not guilty of being involved in the conspiracy count, and that his admission as to the drugs found within his car was the only time he had ever purchased cocaine.  (See Tr. Sentencing 28, 34, Doc. 262.)  Petitioner still would have required the Government to put on its case, which would necessarily have included evidence related to Count Two, as it was Boyd's meeting with Townsend and the subsequent stop of Boyd's vehicle and discovery of cocaine within it that led to the conspiracy count.

Petitioner is unable to show a reasonable probability that he would have gained the benefit of a sentence reduction, even if he had pleaded guilty to Count Two prior to trial.  In denying the request of an acceptance of responsibility adjustment, the Court did not deny it simply based on the fact that the concession of guilt occurred in counsel's opening statement and not prior to trial, explaining as follows:

> Application Note 2 indicates that this adjustment is not intended to apply to a Defendant who puts the Government to its burden of proof at trial by denying the essential factual elements of guilt.

> While Defendant may have admitted his guilt to Count Two, he continued to deny the essential elements of Count One, to which he was found guilty. Under these circumstances the Court does not find that a downward adjustment under Section 3E1.1(a) for acceptance of responsibility is warranted.

(Id. at 34-35, Doc. 262.) Thus, even if Petitioner had pleaded guilty to Count Two earlier, the Court explained that because he continued to deny his guilt as to Count One and decided to put the government to its burden of proof as to Count One, an acceptance of responsibility deduction would not have been warranted. There would have been no difference in the sentencing outcome. Accordingly, because Petitioner cannot show prejudice from counsel's alleged ineffectiveness, his claim will be denied.

### C. Ground 3: Failure to Properly Argue Career Offender Status

Petitioner argues that counsel was ineffective at sentencing for failing to properly argue that his prior conviction did not count as a qualifying conviction for purposes of career offender determination. The prior conviction was for Possession with Intent to Deliver Cocaine, at Allegheny County Court of Common Pleas Docket No. 94-10479. Petitioner was sentenced on May 9, 1995, to a term of imprisonment of 1 ½ to 3 years, and 2 years of probation. The argument Petitioner presents is essentially the same argument presented at sentencing: that the Pennsylvania Board of Probation and Parole had adjusted Petitioner's state sentences in such a way that he was released from one of his prior convictions more than fifteen years prior to the offense of conviction. That argument was rejected at sentencing and on appeal. However, Petitioner now claims that counsel was ineffective: (i) in failing to conduct a proper investigation to uncover, and present to the Court, documentation to substantiate his claim; and (ii) in failing to properly understand the basis of the argument and to properly present such argument to the Court that would have demonstrated that his state conviction did not qualify for the career offender enhancement.

The Court finds that Petitioner's argument is the same argument his trial counsel made at sentencing in a slightly modified manner. According to the Pennsylvania Board of Probation and Parole, Petitioner was paroled for the offense at Docket No. 94-10479 on January 9, 1998; however, since he was serving a federal sentence during his parole, he was unsupervised. The case closed on May 19, 1999, which was his maximum release date according to the Board of Probation and Parole. As discussed below, using his maximum sentence date of May 19, 1997, the conviction falls within the 15-year window for career offender status.

Prior to sentencing, trial counsel objected to the application of career offender enhancement, arguing that the sentence was outside the 15-year window, and that he had requested documentation to substantiate the release date. (Doc. 232, 4-5). In response to trial counsel's initial objection, the Probation Officer explained in more detail why Petitioner's conviction at Docket No. 94-10479 was within the 15-year window:

> The defendant was sentenced on May 9, 1995. According to the Pennsylvania Board of Probation and Parole, the defendant was paroled to a detainer on November 5, 1997, and then officially paroled in this case on January 9, 1998. The time period for when the defendant was officially released on parole (January 9, 1998) and the defendant's commencement of instant offense (December 2011 to February 1, 2012) is approximately 14 years. Therefore, the probation officer stands by the information contained in the presentence report.

(Addendum to Presentence Report 4.)

Petitioner's counsel re-raised his argument that Docket No. 94-10479 was not within the 15-year window in his Sentencing Memorandum, which included newly obtained documents received from the Board of Probation and Parole. (Sentencing Mem. 19-23.) The documents included the following: (i) the May 9, 1995 Sentencing documentation; (ii) a July 29, 1996 Letter from the Board's Secretary to SCI-Albion; (iii) an August 1, 1995 sentence profile generated by the Board of Probation and Parole; (iv) an August 7, 1996 sentence profile; (v) a July 29, 1996

letter from SCI-Albion to the Board of Probation and Parole; (vi) an August 15, 1996 Request for Special Probation/Parole Supervision by Allegheny County; and (vii) a February 20, 1996 Acceptance for State Supervision form.  (Exhibits F-K to Sentencing Mem.; and Exhibit D attached to Doc. 239.)

The Probation Officer reviewed the documents counsel submitted, contacted officials at SCI-Camp Hill, and contacted officials at the Pennsylvania Board of Probation and Parole (who she had already been in contact with in preparing the Presentence Report).  (Supp. Addendum 2.) Officials from both the Pennsylvania Board of Probation and Parole and SCI-Camp Hill confirmed that Petitioner's parole date was January 9, 1998, and that the case closed on May 19, 1999.  (Id.)  In addition, the Board of Probation and Parole does not separate sentences for aggregated convictions and so, as far as the Board was concerned, Petitioner was incarcerated on all of the aggregated convictions in question at the same time.  (Id.)

The Probation Officer accepted counsel's argument that Petitioner's maximum sentence would have been May 19, 1997, if he had not been revoked.  Using May 19, 1997, rather than the January 9, 1998 parole date, still results in the conviction falling within the 15-year window. (Id.)  The Probation Officer explained that the February 20, 1996 Acceptance of State Supervision form, merely confirms the original effective dates of May 19, 1997 and May 19, 1999.  (Id. at 3.)

At sentencing, the Court ruled that the conviction at Docket No 94-10479 was properly determined to fall within the 15-year window, and that it qualified as a prior conviction for career offender status.  (Tr. Sentencing 31.)  In rejecting counsel's argument, the Court noted that the Acceptance for State Supervision form

> indicates that the Defendant would be released and begin his two-year probation term on the effective date of 5/19/1997, Defendant's original maximum date.

> That the Defendant could have theoretically been released outside the 15-year
> window is just that, theoretical.  There is no evidence that Defendant was paroled
> or otherwise released.

(Id. at 33.)  The Court further stated that "all the documents in this case, including those provided

by Defendant, indicate that Defendant was still imprisoned on the possession charge at his max

date of 5/19/1997; and, therefore, the Court concludes that he was imprisoned on this charge

within the 15-year window."  (Id.)

The United States Court of Appeals for the Third Circuit affirmed Petitioner's sentence,

stating with respect to the instant issue that the Court "did not err in designating Boyd as a career

offender," and the Court "correctly found that Boyd had at least two prior felony convictions

before the instant offense that qualified him for the career offender designation."  Boyd, 625 F.

App'x at 187.  The Court of Appeals also specifically noted that the "period of incarceration on

Boyd's 1995 conviction extended into the 15-year period within the meaning of Section

4A1.2(e).  Thus, Boyd's pro se argument that it is not a qualifying offense is unsustainable."

Boyd, 625 F. App'x at 187 n.13.

In his Reply Brief, Petitioner maintains that he is *not* raising the same arguments

previously raised at sentencing and on appeal.  (Pet. Reply 11.)  He contends that the "essence"

of his claim is:

> prior counsel was objectively unreasonable in his failure to investigate and
> properly explain and substantiate that the Petitioner's sentencing position [is] that
> his state convictions did not qualify for the career offender enhancement because
> the parole board had adjusted his sentences in a manner that put his conviction
> beyond the 15-year window.

(Id.)  Moreover, he submits that "for the first time [Petitioner] has now supplied exhibits

correctly stating and substantiating his position, which he contends counsel should have

presented to the Court."  (Id.)

The Court disagrees.  Trial counsel submitted seven exhibits to the Court prior to trial in support of his argument.  In his motion to vacate, Petitioner submits four exhibits, all of which trial counsel already submitted.  (Trial counsel's Exhibits G, H, I and K, attached to Doc. 241, are Petitioner's Exhibits A, D, C and B, respectively.)  The arguments are essentially the same.  Both argue that the Board of Probation and Parole adjusted Petitioner's sentences after his probation was revoked on an earlier unrelated case and that the logical end result is that his parole date on the relevant conviction is November 19, 1995.  Petitioner argues that Exhibit C (trial counsel's Exhibit I) demonstrates that parole on Docket No. 94-10479 must have commenced nine months before the newly adjusted effective date of the sentence imposed on the probation revocation.  Despite this slight difference in explanation of this document, it is essentially the same argument trial counsel made.  The Court determined that, as a result of Petitioner's revocation, it is only theoretical that he might have been paroled on Docket No. 94-10479 on November 19, 1995, but the facts remain that he was incarcerated, the Board confirmed that his earliest release date was May 19, 1997, and that date falls within the 15-year time period to qualify as a prior conviction for career offender status.

Petitioner's argument at bottom relies on the Board's record keeping rules regarding aggregation of sentences, not on an actual release date of his prior conviction.  Petitioner's argument is in effect a request to benefit at his Federal sentencing because the Board adjusted the release date for his initial state sentence due to Petitioner's detention on a subsequent revocation violation.  The Court's response to this argument, which was upheld on appeal, was that, as Petitioner violated his probation, his release outside the 15-year window was only theoretical.  Petitioner's actual release date on the prior conviction at Docket No. 94-10479 was May 19,

1997.  He was not paroled from that sentence, and the offense of conviction therefore qualifies as a predicate offense for determining career offender status.

### D.  Ground 4: Cumulative Effect

The Court concludes that the cumulative effect of trial counsel's conduct did not deprive Petitioner of his rights under the Fourth, Fifth and Sixth Amendments to due process, a fair trial, fundamental fairness or the effective assistance of counsel, as—for the reasons stated above— counsel's allegedly ineffective assistance was not prejudicial.

### E.  Certificate of Appealability

No certificate of appealability should issue in this case.  A court should issue a certificate of appealability where a petitioner makes a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  A petitioner meets this burden by showing that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Court finds that jurists of reason would not find it debatable whether Petitioner states a valid claim for the denial of a constitutional right and jurists of reason would not find it debatable whether the Court is correct in concluding that the petition does not present any claims upon which habeas relief may be granted.  Therefore, the Court will deny a certificate of appealability.

Having found no merit to Petitioner's claims of ineffectiveness of counsel or the cumulative effect of such claims, Petitioner's Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 will be denied.

\*    \*    \*

Accordingly, IT IS ORDERED that:

Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence pursuant to 28

U.S.C. § 2255 (Doc. 345) is **DENIED**.  A Certificate of Appealability is **DENIED**.


October 4, 2018                                    s\Cathy Bissoon_____
                                                   Cathy Bissoon
                                                   United States District Judge


cc (via ECF email notification):

All Counsel of Record